**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| AMBER BLACKBURN,<br>57 Hawthorne Drive<br>Ashville, Ohio 43103 | : | |
| | : | |
| Plaintiff, | : | **CIVIL COMPLAINT** |
| v. | : | **JURY DEMAND ENDORSED HEREIN** |
| CITY OF COLUMBUS,<br>90 West Broad Street<br>Columbus, Ohio 43215 | : | |
| | : | |
| and | : | |
| ELAINE BRYANT, CHIEF,<br>120 Marconi Boulevard<br>Columbus, Ohio 43215 | : | |
| | : | |
| and | : | |
| NICK KONVES, ASSISTANT CHIEF,<br>120 Marconi Boulevard<br>Columbus, Ohio 43215 | : | |
| | : | |
| and | : | |
| KATE MCSWEENEY-PISHOTTI,<br>Director, Public Safety Director's Office<br>77 North Front Street<br>Columbus, Ohio 43215 | : | |
| | : | |
| and | : | |
| CHRISTOPHER DARLINGTON,<br>120 Marconi Boulevard<br>Columbus, Ohio 43215 | : | |
| | : | |
| and | : | |
| IAN MANSPERGER,<br>120 Marconi Boulevard<br>Columbus, Ohio 43125 | : | |

Defendants.                              :

## COMPLAINT

Plaintiff Amber Blackburn, by and through undersigned counsel, and for her Complaint against the City of Columbus, Chief Elaine Bryant, Assistant Chief Nick Konves, Director Kate McSweeney-Pishotti, Officer Christopher Darlington, and Officer Ian Mansperger (hereinafter collectively "Defendants") states as follows:

## NATURE OF ACTION AND JURISDICTION

1. Subject-matter jurisdiction over this action is conferred under 28 U.S.C. § 1331, as Plaintiff's causes of action arise under the laws of the United States, as well as 28 U.S.C. § 1367, as Plaintiff's state law claims arise from the same case or controversy and are subject to supplemental jurisdiction.

2. Venue is proper in the United States District Court for the Southern District of Ohio, Easten Division, because all parties reside or are geographically situated within the jurisdiction. 28 U.S.C. § 1391(b)(1). Moreover, venue in this Court is also appropriate because all relevant events giving rise to Plaintiff's causes of action occurred within the Southern District of Ohio. 28 U.S.C. § 1391(b)(2).

3. Plaintiff has complied with all jurisdictional prerequisites to the filing of this lawsuit and her Complaint is filed within ninety (90) days of her receipt of a Right to Sue letter from the Equal Employment Opportunity Commission, attached hereto as Exhibit A.

## PARTIES

4. Plaintiff Amber Blackburn (hereinafter "Ms. Blackburn") is an individual residing in Pickaway County, Ohio. At all times relevant to the instant Complaint, she was

2

employed by Defendant City of Columbus as a police officer with the Columbus Division of Police.

5. Defendant City of Columbus (hereinafter "the City") is a political subdivision of the State of Ohio which is geographically situated in Franklin County, Ohio, and was at all times relevant the employer of Ms. Blackburn.

6. Defendant Chief Elaine Bryant (hereinafter "Chief Bryant") is the current Chief of the Columbus Division of Police and held that position at all times relevant to the instant Complaint. She is the lead authority for that entity and is sued in her personal and official capacity.

7. Defendant Assistant Chief Nick Konves (hereinafter "Assistant Chief Konves") is an Assistant Chief of the Columbus Division of Police and held that position at all times relevant to the instant Complaint. He is the lead authority within the Operations Branch of CPD and is sued in his personal and official capacity.

8. Defendant Director Kate McSweeney-Pishotti (hereinafter "Director McSweeney-Pishotti) is the Director of the Public Safety Division of the City of Columbus and held that position at all times relevant to the instant Complaint. She is the lead authority within the Public Safety Division and is sued in her personal and official capacity.

9. Defendant Officer Christopher Darlington (hereinafter "Officer Darlington") is a law enforcement officer employed by the Columbus Division of Police and held that position at all times relevant to the instant Complaint. He is sued in his personal and official capacity.

10. Defendant Officer Ian Mansperger (hereinafter "Officer Mansperger") is a law enforcement officer employed by the Columbus Division of Police and held that

position at all times relevant to the instant Complaint. He is sued in his personal and official capacity.

11. The conduct of Defendants Chief Bryant, Assistant Chief Konves, Director McSweeney-Pishotti, Officer Darlington, and Officer Mansperger falls outside the scope of Ohio political subdivision immunity because their acts were committed with malicious purpose, in bad faith, or in a wanton and reckless manner, and further constituted violations of clearly established federal prohibitions against sex and race discrimination by public employers.

## FACTS

12. Plaintiff incorporates and realleges by reference all allegations set forth in Paragraphs One through Eleven of the Complaint as if fully restated herein.

13. Ms. Blackburn is a white female who is currently thirty-five years old.

14. The City is, and was at all times relevant to this Complaint, an employer with fifteen or more employees.

15. On August 14, 2023, Ms. Blackburn was hired by the City as a Police Officer for the Columbus Division of Police (hereinafter "CPD"). She was placed on probationary status until March 15, 2025.

16. During her probationary status, Ms. Blackburn was an exemplary employee with no disciplinary history and, in all respects, conducted herself in an appropriate manner.

17. On the evening of January 25, 2025, while off duty, Ms. Blackburn went to dinner to meet with friends and socialize. Specifically, Ms. Blackburn and a friend were celebrating recent birthdays.

18. Following dinner, the group began to walk along High Street, and saw a bar called TownHall. Being unfamiliar with that establishment, the group decided to go in after having their respective I.D.'s checked by security.

19. Due to the cold weather, TownHall had erected a temporary breezeway just outside the main entrance. Within that shelter there were two CPD officers who Ms. Blackburn did not recognize.

20. Upon information and belief, the two CPD officers were Officer Christopher Darlington and Officer Ian Mansperger, who were at that time working special duty at TownHall.

21. As she passed by the two officers, one of them made a disparaging remark about Ms. Blackburn's former husband, who had previously been terminated from CPD due to misconduct.

22. After hearing that comment, Ms. Blackburn asked the officer if he knew her. In response, he instructed Ms. Blackburn to "move the f--- on." Though her party was concerned about the interaction, they collectively decided to let the incident pass and entered the building. The following hour passed without incident.

23. After midnight, on January 26, 2025, Ms. Blackburn's group began to be harassed by three unknown women. One of the women was tall with brown hair, one was tall with red hair, and the final woman was short with brown hair.

24. The third woman complained that Ms. Blackburn's companions were too close to their table. Notably, the interior of the bar was filled with people at that time and, as a consequence, free space was in limited supply.

25. Though Blackburn's party tried to give the women more space, the first two women began to push backwards aggressively into Ms. Blackburn. When Ms. Blackburn moved to the other side of her group's table to avoid further contact, the two women followed.

26. Shortly thereafter, the tall brunette threatened to fight one of Ms. Blackburn's female companions. Ms. Blackburn inserted herself between the two and stated that it was time for everyone to leave.

27. In response, both the tall brunette and the tall redhead began to shove Ms. Blackburn into her friends. One of her companions told the women that the group would be leaving and asked the two to stop.

28. Almost immediately afterward, the tall brunette stepped in close and told the Blackburn party to leave or she would "f--- someone up." She then focused on Ms. Blackburn and stated, "I'll beat your a--." To punctuate her words, she then put her hand in Ms. Blackburn's face and threatened that she would "smack the sh--" out of her. Plaintiff advised that they were just out to celebrate her birthday and wanted to have fun.

29. In response, the tall brunette balled her hand into a fist and struck the side of Ms. Blackburn's face in a side-chopping fashion. Fearing additional violence, Ms. Blackburn struck back at her assailant.

30. This physical altercation occurred over the course of a few seconds. Thereafter, one of Ms. Blackburn's friends separated the two women and began to escort Ms. Blackburn away.

31. While moving away, Ms. Blackburn encountered the tall redhead female. At this point, the second woman began to yell at Ms. Blackburn. While doing so, she spat on Ms.

Blackburn's face. This resulted in a second physical altercation which, once more, ended quickly.

32. While wiping the spit from her face, Ms. Blackburn saw that Officers Darlington and Mansperger had stood up to observe. Her group continued out of the building and joined the officers in the breezeway. At that time, neither officer's body-worn camera was activated.

33. One of Ms. Blackburn's companions immediately informed the officers that she had been assaulted. Ms. Blackburn added that she had been spat on while the officers were looking. Officer Darlington agreed that they had watched, but then responded that, "I don't give a f---." Officer Mansperger, for his part, suggested that the conversation be taken completely outside.

34. Another of Ms. Blackburn's friends told Officer Mansperger that the officers needed to do something about the incident. In response, Officer Darlington pushed him against the wall of the temporary shelter and told him that he had to leave or he would be arrested.

35. Thereafter, Ms. Blackburn's group exited the shelter with the two officers close behind.

36. Once outside, Ms. Blackburn attempted to explain the situation to the officers. The two replied that they "did not care." They further instructed the group to "get the f--- out and leave." When Ms. Blackburn protested and told the officers that they had to investigate the assault, they once more indicated that they "did not care."

37. Another member of the party tried to tell Officers Darlington and Mansperger that Ms. Blackburn had been assaulted. They also told him that they "did not f------ care."

7

38. Ms. Blackburn asked Officer Darlington to pull surveillance footage. He refused. She asked him to prepare a report. He refused and further added that he was under no obligation to do so while working special duty.

39. Shortly thereafter, the two officers returned to the breezeway. Several minutes later, Officer Mansberger came back out and told Ms. Blackburn that TownHall employees were claiming that she had started the altercation.

40. Ms. Blackburn once more reiterated that the surveillance footage would clear up any dispute about the cause of the fight. Officer Mansberger took the opportunity to mock Ms. Blackburn's speech impediment, which she has had since birth. In response, Ms. Blackburn questioned his maturity and inquired about his age.

41. The following day, Officer Darlington provided his supervising Sergeant with a deliberately false version of the foregoing events. Officer Mansperger later provided a slightly more accurate, but still incomplete, account.

42. On January 27, 2023, when Ms. Blackburn reported for work, she was immediately confronted by Sergeant Parker, who advised that the situation was "not good." Thereafter, he escorted her to a meeting with Assistant Chief Nick Konves, Lieutenant Hawkins, and Deputy Chief Denner.

43. Assistant Chief Konves informed Ms. Blackburn that she was being terminated, effective immediately, for assaulting three people. He advised that, if she left quietly, she could resign on "good terms." Otherwise, the termination would be on "bad terms." Paperwork for both alternatives had already been prepared and was presented to Ms. Blackburn.

44. Though Ms. Blackburn acknowledged that there had been an incident, she denied that she had assaulted three people.

45. At that time, Assistant Chief Konves claimed that he had reviewed surveillance footage which confirmed that Ms. Blackburn had assaulted three people. Moreover, he alleged that the recording showed that two of the assaults had occurred while CPD officers had been trying to detain her. Finally, he claimed that the officers had been required to use force because Ms. Blackburn was "belligerently drunk" and "unable to stand on her own."

46. When making these claims about Ms. Blackburn's purported misconduct, Assistant Chief Konves knew that each assertion was entirely false.

47. In fact, the TownHall surveillance footage of the events directly contradicts each of the allegations made by Assistant Chief Konves.

48. Despite his actual knowledge of the falsity of his accusations, Assistant Chief Konves repeated them in writing in a termination report, as well as a letter to Chief Bryant, in a successful effort to secure Ms. Blackburn's termination by the City.

49. At no time did Chief Bryant or Director McSweeney-Pishotti engage in any effort to ensure that the information provided by Assistant Chief Konves was accurate or in any way verified by any credible source of information.

50. Ms. Blackburn, knowing that Assistant Chief Konves' assertions were false, stated that none of his allegations were true. Assistant Chief Konves then claimed that he had spoken to "all three victims" and "all of the witnesses." This was, once more, a complete falsehood. Assistant Chief Konves had not spoken to the alleged victims or witnesses and was, at that time, completely ignorant as to their identities.

9

51. Upon information and belief, CPD has never identified any of the alleged victims or witnesses beyond Officers Darlington and Mansperger.

52. After providing these completely manufactured justifications for Ms. Blackburn's termination, Assistant Chief Konves left the room.

53. When asked if Assistant Chief Konves had spoken to anyone about the situation, Deputy Chief Denner admitted that, to his knowledge, Konves had not done so.

54. Rather than signing the resignation paperwork, which required her to falsely admit misconduct, Ms. Blackburn instead signed the involuntary termination paperwork and left.

55. In a January 27, 2025 letter to the CPD Chief of Police, Assistant Chief Konves had requested Ms. Blackburn's termination. In a written communication to Chief Bryant, he made several knowingly false statements, including but not limited to the following:

   a. That Ms. Blackburn was seen to be throwing punches at another female's head as that female was walking away;

   b. That Ms. Blackburn was acting erratically and was being restrained by another male;

   c. That Ms. Blackburn refused to comply with CPD orders and had to be physically removed from TownHall;

   d. That Ms. Blackburn had to be guided into a wall to control her actions;

   e. That Ms. Blackburn was highly intoxicated, belligerent, and dismissive; and

   f. That surveillance footage reflected three assaults, two of which occurred while Ms. Blackburn was being restrained and removed from the bar.

56. As previously noted, these claims are all false and directly contradicted by the surveillance footage provided by TownHall.

57. Despite the surveillance footage directly contradicting the findings expressed by Assistant Chief Konves, Chief Bryant and Director McSweeney-Pishotti ratified his recommendation of termination and did, in fact, terminate Ms. Blackburn.

58. A subsequent internal investigation revealed that Officers Darlington and Mansperger had materially misrepresented many of their claims about the events which transpired at TownHall.

59. The same investigation revealed that no alleged victims or witnesses were ever identified, much less interviewed.

60. Despite having actual knowledge that the information giving rise to Ms. Blackburn's termination was so inaccurate and misleading that reporting Officers Darlington and Mansperger were themselves disciplined, none of the City, Chief Bryant, Assistant Chief Konves, or Director McSweeney-Pishotti engaged in any effort to rectify her unjustified and unlawful termination.

61. Ms. Blackburn's immediate termination from CPD, even for an individual on probationary status, constitutes a substantial departure from the City's normal disciplinary process and common outcomes.

62. Similarly situated probationary individuals, particularly minority-race males but also including minority-race females, are afforded meaningful investigations into potential misconduct as a matter of course. Moreover, even had Assistant Chief Konves' allegations been true, similar and more egregious conduct by minority-race males has generally resulted in internal discipline and training rather than immediate termination.

63. There is no rational explanation for the duplicity of Officer Darlington, Officer Mansperger, or Assistant Chief Konves, the inaction of Chief Bryant and Director McSweeney-Pishotti, or for Ms. Blackburn's disparate treatment, save one: that the City's claims against her were nothing more than a pretextual justification for an unlawful termination.

64. Following Ms. Blackburn's termination, an agent of the City provided a statement misrepresenting the events of January 26, 2025.

65. The Defendants' conduct was not only violative of federal anti-discrimination laws but has also publicly placed Ms. Blackburn in a false light and significantly interfered with her ability to secure meaningful employment.

66. The Defendants' individual and collective acts were done maliciously or, at best, with willful and wanton disregard for Ms. Blackburn's constitutional rights.

**COUNT ONE – RACE AND SEX DISCRIMINATION**
**42 U.S.C. § 2000e-2(a)**

67. Plaintiff incorporates and realleges by reference all allegations set forth in Paragraphs One through Sixty-Six of the Complaint as if fully restated herein.

68. The City is an "employer" as that term is defined by 42 U.S.C. § 2000e(a)&(b).

69. Between August 14, 2023, and January 27, 2025, Ms. Blackburn was the City's "employee," as that term is defined by 42 U.S.C. § 2000e(f).

70. Under 42 U.S.C. § 2000e-2(a)(1), it is an unlawful employment practice to discriminate against an employee with respect to his or her compensation, terms, conditions, or privileges of employment because of such employee's race or sex. Similarly, under 42 U.S.C. § 2000e-2(d), it is unlawful for any employer controlling training or retraining,

12

including on-the-job training, to discriminate against any individual because of his or her race or sex.

71. Additionally, under 42 U.S.C. § 2000e-2(k)(1), it is an unlawful employment practice to utilize an employment practice which causes a disparate impact on the basis of race or sex and the practice is not job related for the position in question and consistent with business necessity.

72. Ms. Blackburn is a white woman.

73. The facts of this case demonstrate that the City discriminated against Ms. Blackburn due to her race, sex, or both.

74. Specifically, the City terminated Ms. Blackburn's employment in the absence of any meaningful investigation and, in fact, when the circumstances demonstrated that its decision was predicated upon completely fabricated evidence.

75. Moreover, even if the conduct of the City was not reflective of the its intent to actively discriminate against white women, Ms. Blackburn was terminated from her employment in the absence of any meaningful investigation, much less proof of actual misconduct, despite probationary officers of minority races, particularly males, being afforded the courtesy of an investigation and remaining in the City's employ despite actual proof of similar or more egregious alleged misconduct.

76. In short, the conduct of the City and its agents reflects an intent to discriminate against white women, to hold white women to a different standard than both male and minority employees or otherwise subject them to disparate treatment, or both. As such, the City has acted either intentionally and with malice, or at best with reckless indifference to Ms. Blackburn's protected rights.

77. The City has not and cannot provide a legitimate, nondiscriminatory justification for subjecting Ms. Blackburn to intentional discrimination or disparate treatment.

78. Moreover, given the clearly fabricated basis for Ms. Blackburn's termination, any newly manufactured explanation provided by the City would clearly be pretextual.

79. As a direct and proximate result of the City's unlawful employment practices, Ms. Blackburn suffered damages including, but not limited to, lost wages, lost the benefits associated with employment as a CPD officer and government employee, and experienced diminished job opportunities, public embarrassment and humiliation, as well as mental and emotional distress.

80. Accordingly, the City is liable to Ms. Blackburn for the aforementioned damages.

## COUNT TWO – DEPRIVATION OF ESTABLISHED RIGHTS
### 42 U.S.C. §§ 1981 & 1983

81. Plaintiff incorporates and realleges by reference all allegations set forth in Paragraphs One through Eighty of the Complaint as if fully restated herein.

82. By terminating Ms. Blackburn's employment because of her race and sex, and by pursuing discriminatory employment policies that resulted in that termination, Defendants have collectively violated 42 U.S.C. § 1981, which prohibits such discrimination with respect to employee contracts, as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

83. Accordingly, Defendants are liable to Ms. Blackburn under 42 U.S.C. § 1983, which prohibits such conduct by persons acting under color of state law.

## COUNT THREE – TORTIOUS INTERFERENCE WITH EMPLOYMENT RELTIONSHIP

84. Plaintiff incorporates and realleges by reference all allegations set forth in Paragraphs One through Eighty-Three of the Complaint as if fully restated herein.

85. At all times relevant to the Complaint, Ms. Blackburn had an employment relationship with the City. Defendants were, individually and collectively, aware of that relationship.

86. The conduct of Officer Darlington, Officer Mansperger, and Assistant Chief Konves, individually and collectively, was intended to maliciously interfere with and disrupt, and did interfere with and disrupt, Ms. Blackburn's employment relationship with the City.

87. The false claims made by Defendants Darlington, Mansperger, and Konves were entirely unjustified by any legitimate employment or disciplinary purpose.

88. Accordingly, Defendants Darlington, Mansperger, and Konves are liable to Ms. Blackburn for the damages associated with their tortious interference with her employment relationship with the City.

## PRAYER FOR RELIEF

**WHEREFORE,** in light of the foregoing, Plaintiff demands judgment in her favor against Defendants; that she be awarded back pay, compensatory damages, costs, punitive damages and attorney fees to the extent permitted by law, pre- and post-judgment interest, as well as any other relief this Court deems appropriate.

Respectfully submitted,

/s/ Samuel H. Shamansky
SAMUEL H. SHAMANSKY CO., L.P.A.

15

Samuel H. Shamansky (0030772)
Donald L. Regensburger (0086958)
523 South Third Street
Columbus, Ohio 43215
(614) 242-3939 – Phone
(614) 242-3999 – Fax
shamanskyco@gmail.com

Counsel for Plaintiff

## DEMAND FOR JURY TRIAL

Trial by jury is demanded on all issues so triable.

Respectfully submitted,

/s/ Samuel H. Shamansky
SAMUEL H. SHAMANSKY CO., L.P.A.

Samuel H. Shamansky (0030772)
Donald L. Regensburger (0086958)
523 South Third Street
Columbus, Ohio 43215
(614) 242-3939 – Phone
(614) 242-3999 – Fax
shamanskyco@gmail.com

Counsel for Plaintiff